## MURPHY v. CITY OF ROTAN.

### No. 1993.

Court of Civil Appeals of Texas. Eastland.

March 29, 1940.

Rehearing Denied April 19, 1940.

Smith & Smith, of Anson, for appellant.

T. J. McMahon, of Abilene, Morris Watson, of Rotan, and Roy Formway, of Roby, for appellee.

LESLIE, Chief Justice.

Artis Murphy, a minor by next friend, filed this suit against the City of Rotan, a municipal corporation, to recover damages for the loss of "his left hand, except a portion of two fingers." He alleges the injuries to be the proximate result of defendant's negligence in storing dynamite caps in the city hall. He alleges the city was guilty of "actual as well as passive negligence in permitting said dynamite caps to be left open and unguarded *、* * and that the appellee's officers, agents and employees knew * * * or could have known by the exercise of ordinary care of the danger incident to leaving such dangerous explosive substance as dynamite caps exposed and unguarded in a public place and in the public city hall where appellee, its officers, agents and employees knew * * * or could have known by the exercise of ordinary care that the school boys of the town had access to said city hall for the purpose of getting the daily newspapers each day to be delivered over the town, and that the appellee, its officers, agents and employees knew *. * * or could have anticipated the danger or harm that would result from leaving dangerous explosive substance as dynamite caps in said public hall which was daily visited by school boys who were going in and out of said public hall at the time said dangerous instruments were so exposed, etc."

The appellee answered by general demurrer, general denial, and among other defenses specially alleged contributory negligence as well as an intervening independent cause, relieving the appellee from responsibility, in that the dynamite caps were taken from the city hall unlawfully or by theft, etc.

The trial was before the court and jury and at the close of the plaintiff's testimony the court sustained the defendant's motion for an instructed verdict. A judgment was entered accordingly, motion for new trial was overruled and the plaintiff appeals.

Said action of the trial court is assigned as error.

The facts in evidence necessary to reflect the reasons for our conclusions will be stated in substance:

Artis Murphy, the injured minor, was 17 years of age at the date of this unfortunate occurrence on January 28, 1938. He was a member of the senior class of the Rotan high school at the 1937–1938 term, and in daily attendance on its sessions. He uniformly made his grades and graduated at the end of that term. The accident occurred in the study hall on the third floor of the building about 11:15 or 11:18 a. m. Murphy testified that "in going from the English class that morning to the stairway that led up" he found a "brass cap"; that it "looked like a 22 special cartridge that had fired—bigger than a 22 cartridge." That he had not seen one before and "did not know what it was." That he "found it under a locker where Don [Knott] was; it was about 12 feet from the stairway * * * up to the third floor." That Don (who had taken five dynamite caps at the city hall) was "at his locker at that time putting some books in or taking some out." That Don's locker was "about four feet

high." That there was another locker "under his (Don's) locker down nearer the floor than" Don's; that "with reference to where Don was standing" the cap "was just off to one side, just a little bit." "Q. Did you see it fall there or drop there? A. No, I had to reach down under his feet to get it."

The appellant further testified that on picking up the cap, he said nothing about it but took it to the study hall where he showed it to a cousin who wanted it, but from whom he (appellant) "took it * * * before it went off." "Q. Now, how long after you got in the study hall before you began to fool with this brass cap? A. Just as soon as I got seated I began fooling with it." That he "was seeing what was in it; examining it" with a hair pin which he had gotten "from a girl in front"; that the cap was about one third full of something "like chalk." · That he removed some of it from the cap; that he had no "idea there was any danger to it." That no one told him what it was. That he "had been fooling with it" when it exploded "but a short while"; that it exploded with the injurious effects above stated.

On cross-examination the appellant testified further that when he picked the cap up he "did not hear it drop." That when he "first saw it, it was on the floor." That "it happened that Don Knott was there putting his books up or taking them out of the locker." "Q. You don't tell the jury that Don Knott dropped it do you? A. No, I don't know for sure that Don dropped it." Appellant also· stated to Mr. Little, a teacher, that he found the cap "under a locker."

The following stipulation was entered into between the parties with respect to the witness, J. D. Corhn. "It is agreed by the parties that J. D. Corhn, if present and testifying, would testify that he sold the city of Rotan dynamite and dynamite caps during the time that they had the Works Progress going on and that he was paid by the Secretary Mr. [T. B.] Knott, and that he is the only dealer in Rotan that handles ·dynamite and dynamite caps so far as he knows and that he sold dynamite and dynamite caps to others in and around Rotan, desiring same at or about the same time."

T. B. Knott was the father of witness Don Knott, and also secretary of the Rotan city council with office in the city hall where the explosives are alleged to have been kept for the convenience of those engaged in the construction of a municipal swimming pool with the aid and supervision of the Works Progress Administration.

Don Knott, called as a witness by the appellant, testified that at the time of the accident he was 16 years old, a junior in the local high school, boy scout, etc. That he was in the study hall at the time of the accident; that before that time he had a dynamite cap in his possession; that at first he did not know what the cap was, but found out what it was before the explosion; that he saw them in a tin box "on a drawing table" at the· city hall about a month before the accident, or sometime from December 1 to December 15. That he got some dynamite caps "out of an office at the city hall", taking them off a "drawing table" (engineer's). That he got some of them out of a cabinet in a "back room." That these were in a "tin box with lid on" and were not open to view as they were behind a·"wooden handle on each side of the cabinet." "Q. Now, did you ever see a box with those little brass or copper colored caps in any other room in there, except the room where that drawing table was in? A. . No, sir."

The witness testified that on the first occasion he took four caps from the desk— "the drawing table." This was about December "before Christmas." That no one saw him take the caps; that no one knew he had done so, and no one had given him permission to take them. That the caps and fuse had a monetary value at the time he took them.

Soon after taking the caps the witness told Otto Hull, another school boy, that he had taken them, and he gave Hull one of the four caps. Sometime before Christmas the witness talked to Royce Huckaby, another school boy who had clerked in Corhn's hardware store, and Huckaby told him they were dynamite caps. The witness did not remember for certain that Huckaby told him 'how to explode the caps, but · that he (the witness) soon found that out.

After this witness (Knott) learned that these objects were dynamite caps he got some regular dynamite fuse with which to explode "the remaining caps." That he got this fuse from the back room at the city hall out of a shelf under a desk. This, too, was without the knowledge or consent of anyone. That he exploded one of the dynamite caps with a fire cracker and

one of the remaining caps with the fuse, and then had only one of the original caps left, having given the third to Otto Hull. However, according to his testimony, when he went back to get the fuse he took one more cap, making five in all—the only caps he ever took, according to his testimony. This last cap he took from a closed box and knew what he was taking when he did so. At the time of the accident this witness had two caps in his pocket, one of the four originally taken, and the one taken with the fuse. Otto Hull had another of the original four. In part the witness, Don Knott, further testified:

"Q. When the explosion occurred * * * what did you do with the two you had in your pocket? A. I first looked to see if I had them.

"Q. Did you find them? A. Yes sir. * * *

"Q. What did you finally do with them? A. I buried them.

"Q. Where did you bury them? A. In our back yard.

"Q. You never did have any other dynamite caps except the four that you took from the desk on one occasion and the one you took from the cabinet on another occasion? A. That is all.

"Q. Five dynamite caps are all that you ever had? A. Yes sir.

"Q. You exploded two of them? A. Yes sir.

"Q. Gave one to Otto Hull? A. Yes.

"Q. And buried two of them? A. Yes.

"Q. Did you lose any of them, Don? A. No sir.

"Q. When you took the additional dynamite cap, when you went back to get the fuse, were they exposed to public view? A. No sir. * * *

"Q. You are positive, though, that you didn't lose any caps that you took out of the city hall? A. Yes sir."

Otto Hull, also offered as a witness by appellant, corroborated the testimony of Don Knott to the effect that sometime before Christmas of that school year he obtained one dynamite cap from said Knott; that he had it in his possession, and immediately threw it away after the accident in the study hall. That he never took any caps from the city hall, nor did he see any of the other boys take caps therefrom. That about two weeks after getting the cap from Don Knott he learned from Don what the cap was and that he gained this information before the accident. That of the four boys who delivered papers from the city hall, witness never saw anyone but Don Knott with dynamite caps. The witness was positive as to the time and place where he disposed of the cap given him by Don.

Royce Huckaby, a high school boy at the time of the accident, was introduced as a witness by appellant and testified that he had been a clerk in Corhn's hardware store, knew what the dynamite caps were and had sold them in the regular course of business.

We have given careful consideration to the testimony in this record and set out the controlling features of the same. From whatever viewpoint considered, we are driven to the conclusion that the testimony utterly fails to show that the dynamite cap (which exploded resulting in appellant's injury) was ever stored at the city hall, or ever came from that building. In the light of the testimony detailed, it would be mere guess work or speculation to say that the dynamite cap which exploded in the appellant's hand was ever owned, in charge of, or controlled by the city authorities of Rotan, Texas, or even the agents of the Works Progress Administration engaged in the construction of the swimming pool, or other public works in and about the city. The evidence does not show that any negligence of the city caused the injury and much less does it show such negligence, if any, to be the proximate cause of the injury.

The mere fact that the dynamite cap which exploded and injured the appellant was found on the floor near the locker of Don Knott does not make out a case of negligence against the city on any of the alleged grounds presented by the pleadings. This witness (Knott) was introduced by the appellant who vouched for his testimony. He admitted that he had, without the knowledge or consent of anyone, acquired five dynamite caps from the city hall, but in that same testimony he accounted for each of the five caps. It will not do to say that the witness Don Knott told the truth when he said he took five caps from the city hall, but did not tell the truth when he testified as to the disposition he made of each of these caps. Indeed there is nothing but a suspicion or surmise that the exploded dynamite cap ever came from the city hall, or from the possession of the witness Don Knott. In that condition of

the testimony, the trial court correctly instructed the verdict.

■ It will be observed that Don Knott, appellant's main witness, the appellant himself, and others called to testify, were not at the time of the accident small children lacking in discretion. Certainly there was neither allegation nor proof of extreme youth or incapacity on the part of Don Knott tending to alter the legal effect of the tort involved in his acquisition of the dynamite caps. Neither was there any testimony to establish tender years or immaturity on the part of the appellant Artis Murphy. As stated, however, the evidence establishes the intelligence and responsibility of these apparently young men. Hence, the doctrine of the turn-table cases, or the attractive nuisance doctrine has no application under the undisputed testimony reflected by this record.

■ Further, if it be assumed (1) that the city of Rotan was negligent in storing and guarding the dynamite caps and thus permitting one to come into the possession of Don Knott, and (2) that he caused it to come into the possession of the appellant (which assumption is not supported by the testimony) it is undisputed that he, Knott, was a young man of intelligence and fully capable of realizing the turpitude involved in taking the property of another under such circumstances as to bring the act within the classification of theft. That was a tort constituting a new and independent cause intervening between the negligence, if any, of the city, and it broke the causal connection between such negligence (alleged and assumed) and the injuries sustained by the appellant as the result of the explosion, and for this reason the instructed verdict was also correct upon the hypothesis under consideration. It was not incumbent upon the city by virtue of any legal duty to have anticipated as reasonable and likely to happen that some individual with Don Knott's intelligence and maturity would take the caps from the city hall under the facts of this case, and by some means (not shown by any testimony) cause one to come into the possession of the appellant. Hence, the independent and intervening cause which was conclusively shown.

These propositions would seem to be elementary. However, in Hale v. Pacific Tel. Co., 42 Cal.App. 55, 183 P. 280, the Supreme Court held, "Where a boy surreptitiously entered the storehouse of a telephone company and took dynamite caps, knowing the turpitude of his act, and gave such caps to another boy, who exploded one in a toy pistol and was injured, the telephone company was not liable; the independent act of the boy who took the caps having been the proximate cause of the injury."

Also, from Bottorff v. South Construction Co., 184 Ind. 221, 110 N.E. 977, we have the following holding: "Where a 14 year old boy entered the premises of defendant company and removed therefrom dynamite caps and gave them to plaintiff and plaintiff was injured, the proximate cause of his injury was the tort of the infant, *in the absence of any allegation or proof of his incapacity.*" (Italics ours.)

The opinion of the Supreme Court of Massachusetts in Horan v. Town of Watertown, 217 Mass. 185, 104 N.E. 464, 465, is very enlightening on this contention. In that case a group of boys, six or seven to fourteen years of age, took several sticks of dynamite out of a tool box of another at different times and threw them upon a fire and as a result the plaintiff was badly burned by an explosion. In passing upon the issue of negligence in the case that court said:

"The rule applicable to such cases is well settled by our decisions. Where as here the original negligence of the defendant is followed by the independent act of third persons which directly results in injurious consequences to the plaintiff, the defendant's earlier negligence may be found to be the direct and proximate cause of those injurious consequences, if according to human experience and in the natural and ordinary course of events the defendant ought to have seen the intervening act was likely to happen. But if this is not the case, if the intervening act which was the immediate cause of the injury complained of was one which it was not incumbent upon the defendant to have anticipated as reasonably likely to happen, even though a high degree of caution would have shown him that it was possible, then he owed no duty to the plaintiff to anticipate such further acts, the chain of causation is broken and the original negligence cannot be said to have been the proximate cause of the final injury [citing cases]. * * *

"Tested by this rule, the plaintiff's case fails. While the dynamite and the other contents of the box were left in such way that a thief might not find it very difficult

to steal them, it cannot be said that the defendant was bound to anticipate that this might be done and to guard against the consequences that might follow if a thief should steal the dynamite and so use it as to do injury to others. The general presumption of innocence would be inconsistent with this."

Upon this phase of the case, see 25 C.J. 187; Dudley & Orr v. Hawkins, Tex.Civ. App., 183 S.W. 776.

The appellant cites a number of authorities in support of the assignment which he presents. These authorities deal with cases in which the injured party was a person of tender years and lacking in discretion, etc. That is the prominent and controlling element in those cases, as we view it, rendering them inapplicable to the facts of the instant case. The opinion will not be prolonged by a discussion of these authorities.

For the reason assigned the judgment of the trial court is affirmed.